# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH DAKOTA
# WESTERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | CR. 08-50051 |
| Plaintiff, | |
| v. | REPORT and RECOMMENDATION |
| | (Motion to Suppress) |
| **ALVINA WHITE BULL(02)** | |
| **LYLE WILSON (03),** | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending are Defendants' Motions to Suppress Evidence (Doc. 200 Defendant White Bull, Doc. 203 Defendant Wilson). A hearing was held on Tuesday, January 20, 2009.[1] Defendant White Bull was personally present and represented by her counsel of record, Ms. Lorie Melone. Defendant Wilson was personally present and represented by his counsel of record, Mr. Ellery Grey. The Government was represented by Assistant United States Attorney Ms. Mara Kohn. Ms. White Bull, Mr. Wilson, and Oglala Sioux Tribe Department of Public Safety Police Officer Gary Janis testified at the hearing. Fifty-eight exhibits were admitted into evidence. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendants' Motions to Suppress be **GRANTED** in part and **DENIED** in part.

## **JURISDICTION**

Defendants are charged in a Superseding Indictment with conspiracy to distribute and possession with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § § 846,

---

[1] A transcript of the hearing is on file with the Clerk as Doc. 295. References to the hearing transcript will be by "TR" followed by the appropriate page number.

841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(B) and 841(b)(1)(C). The pending Motions to Suppress were referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## FACTUAL BACKGROUND

**Gary Janis's Testimony**

Oglala Sioux Tribe Police Sergeant Gary Janis was on duty on the evening shift of June 8, 2007. TR 9. The evening shift usually runs from 4:00 p.m. until midnight. *Id.* It was a busy night, so he had to work late. *Id.* At about 2:30 a.m. on June 9, Officer Janis received a dispatch call regarding a gun. TR 10. He was outside the jail when he received the call. *Id.* When the officers receive a "gun call" it is their protocol that all officers should respond. *Id.* Janis was supposed to be off duty, but he was still responding to 911 calls. TR 11. Dispatch directed the officers to report to Melva White Bull's residence in the Crazy Horse housing unit. *Id.* A known gang member lived next door to Melva White Bull. TR 91. The call Officer Janis received indicated "suspect at that time was Lawrence Vigil and there was a fight busted out and there was a report of a gun that was involved." *Id.*[2] Officer Janis finished his work at the jail and proceeded to the call with "lights and sirens." TR 11.

While Janis was en route to Melva White Bull's house, he heard other officers on the radio who indicated they had been to Melva White Bull's residence; that they'd had "negative contact" there, and that Lawrence Vigil may have fled the scene to Alvina White Bull's residence. TR 12[3]. Upon hearing this information, Janis headed toward Alvina White Bull's residence which was only three blocks away from Melva White Bull's residence. TR 13. When Janis arrived at Alvina White Bull's residence, he observed Lawrence Vigil in the front yard with an object in his hand that Janis believed to be a weapon. TR 13-14. Janis estimated that this scenario occurred at approximately 2:35 a.m. *Id.* When Janis arrived he jumped out of his squad car and said several times: "do not

---

[2]Officer Janis acknowledged on cross-examination that the neither his report nor the dispatch records specifically name Lawrence Vigil as the suspect. TR 87, 126-127.

[3]Mr. Vigil is Alvina White Bull's son. TR 90.

move; show me your hands; I am a police officer." TR 15.[4] Janis drew his gun but did not point it at Vigil. TR 99. Janis estimated Mr. Vigil looked at him for five seconds before he (Vigil) turned and ran into Alvina's house. TR 15.

Officer Janis explained that the Oglala Police Department answers between five and six calls a week in Alvina White Bull's neighborhood. There is a lot of gang activity in the area. TR 14. There are a lot of drugs sold around there and a lot of fights break out in that area. *Id.* Officer Janis characterized it as a high crime area of Pine Ridge. TR 14-15. When Janis arrived, he parked in the neighbor's (his cousin's) driveway. TR 15, 89. Janis parked in the neighbor's driveway for his own protection because he saw Mr. Vigil standing in the yard as Janis approached. TR 15.

By the time Vigil ran into the house, Officer Janis's backup (Officer Jamerson) had arrived. Officer Janis could hear people running around inside the house. TR 16. Janis could not tell how many people were inside the house. *Id.* Janis explained it is not unusual on the reservation for there to be large numbers of people in the houses because extended family members often stay together. TR 16. He did not know if that was the situation at Alvina White Bull's home. TR 16-17.

After Jamerson and Janis pounded on Alvina's front door for a short time, Alvina opened the door. TR17. Officer Janis ordered Alvina to come out of the house. She complied, and she was ordered to the ground with her hands in the air. TR 19. Janis did this for safety reasons because there were only two officers present and he was unsure how many people remained inside the house. TR 20. The front door remained open, and Officer Janis observed thick smoke hanging low on the ceiling throughout the house and smelled a chemical smell which he believed was indicative of drug use (burning cocaine). TR 20-21. The use of cocaine is illegal on the Pine Ridge Reservation. TR 22. [5]

---

[4]Officer Janis also acknowledged on cross-examination that his report does not indicate he told Mr. Vigil to stop before Vigil went into the house, or that he suspected the object he saw in Mr. Vigil's hand was a weapon. TR 100-101.

[5]Officer Janis's report indicates he could smell the smoke when he entered the home. TR 106. Janis testified he could see the living room and kitchen from the front door. *Id.*

-3-

When Mr. Vigil appeared at the door, Officer Janis ordered him to show his hands. Vigil complied. TR 22. Mr. Vigil was placed on the ground in the front lawn next to Alvina White Bull. No weapon was located on Mr. Vigil's person. *Id.* From his vantage point at the front doorway of the house, Officer Janis could see "tinfoils"[6] on the table which based on his training and experience he knew were used to smoke cocaine. TR 22.

Lyle Wilson appeared at the front door next. TR 23. He was also ordered to show his hands and ordered to the ground outside on the front lawn. *Id.* No weapon had yet been discovered. *Id.* Officer Janis did not know whether more people remained inside the home. *Id.* Janis believed there was a felony in progress and he had not yet located the weapon which had been reported, so he entered the home. *Id.* By that time, a third officer had arrived on the scene. Janis explained that when police officers investigate or detain people on the reservation, often times family members will arrive on the scene and interfere or attempt to harm law enforcement. TR 23. Officer Janis believed there was drug activity going on in Alvina White Bull's home, he had not yet located the reported gun, and he was unsure who remained in the home, so he wanted to locate the gun. TR 24. Janis explained that even after Alvina White Bull, Lawrence Vigil and Lyle Wilson had been removed from the home he did not believe he had time to procure a warrant before going back into the home because it can take several hours to obtain a warrant and he was worried about the destruction of the drug evidence. TR 122, 132. Even after Alvina, Lawrence and Lyle were outside, he had not yet located the weapon and he did not know how many people remained inside the house. TR 132.

Officer Janis conducted a protective sweep though Alvina White Bull's home. TR 26. He did not have a warrant or consent to search the home (TR 91) but he believed he needed to conduct a protective sweep because he had not yet recovered the reported gun and did not know how many people remained in the home. TR 26. In such situations, it is department protocol to conduct a protective sweep. TR 27. During the protective sweep, Officer Janis observed several items in plain view which appeared to be illegal drugs or drug paraphernalia. *See,* Govt. EX 2-15, TR 20-33, 37-

---

[6]Janis explained a "tinfoil" as an 8×10 piece of foil covered with burn marks and white substance. TR 23.

44. He also found a gun magazine, which led him to believe there was a gun present in the house. TR 32, Govt. EX 7.

As Officer Janis walked down the hallway of the home, he heard people moving around in one of the bedrooms. TR 34. The door was locked, so he knocked and announced himself as a police officer and ordered the occupants to come out with their hands up. *Id.* Alvina White Bull's daughter (Anna) opened the door. Anna's boyfriend (Joey Yellow Hair) and Anna's two children were also in the room. *Id.* Officer Janis chided Joey Yellow Hair for allowing children to be present on the premises while illegal drugs were being used; Joey claimed that usually the drugs were ingested outside in the vehicles. TR 36. Officer Janis asked his partner (Jamerson) to detain Anna and Joey while Janis cleared the bedroom. *Id.* Neither Joey Yellow Hair nor Anna White Bull were arrested for child endangerment or any other charge that evening. TR 111. After the bedroom was cleared Janis had not yet found the reported weapon. TR 37.

As Officer Janis conducted a protective sweep of another bedroom, he noticed more drug paraphernalia in plain view. TR 38. In that bedroom, he also saw Lawrence Vigil's wallet on the dresser. *Id.*, Govt. EX 12. Officer Janis also observed what he believed to be narcotics in that bedroom. TR 38, Govt. EX 12, 13.

Officer Janis turned his attention to the vehicles which were parked outside Alvina White Bull's home.[7] He described a large fenced yard with a driveway on the east side. TR 46. There were three vehicles present: a red pickup truck, a Mitsubishi Galant, and a recreational vehicle. *Id.* The red pick up was registered to Freda White Bull. The Mitsubishi was registered to Lawrence Vigil. The motor home/RV was registered to Darrel and Deanna Schrader. *See,* Govt. EX 18. Janis peeked through the driver's side window of the red pickup and observed drug paraphernalia such as rolling papers for marijuana. TR 46. Based on that observation he believed there were probably drugs in the vehicle. TR 51. Next Officer Janis used his flashlight to peek into the Mitsubishi. TR 60. He observed a playing card on the center arm rest with white, twinkling specks on it. *Id.*

---

[7]Officer Janis testified that when he left the house, he vomited from the strong odor. TR 46-47. This detail was also omitted from his written report. TR 110-11.

Officer Janis's training and experience led him to believe this evidence was indicative of cocaine use. *Id.* He believed, therefore, that narcotics were present in the Mitsubishi. *Id.* Officer Janis also looked into the Winnebago recreational vehicle. TR 67. The door was open and he could see a bottle of Crown Royal whiskey sitting on the table. *Id.* Alcohol is illegal on the reservation. *Id.* Based on his observation of the bottle of alcohol through the open door of the RV, and Joey Yellow Hair's statement that illegal narcotics were ingested in the RV, Janis believed he had probable cause to enter the RV. TR 68. Officer Janis seized from the vehicles items which appeared to be drugs or drug paraphernalia. *See*, Govt. EXS 16-17, 19-30, 44-49. A search warrant was later obtained to open a safe which was found in the Mitsubishi. *See,* Govt. EX 52. Cocaine was found inside the safe. TR 85, Govt. EXS 55-56.[8]

Tribal criminal investigators Marvin Bad Wound and Stephanie Leasure arrived on the scene at approximately 3:30 a.m. TR 75. A drug dog was summoned at approximately 4:00 a.m. *Id.* A weapon had not yet been found when the drug dog was summoned. Officer Janis acknowledged there would have been time to secure a search warrant before the drug dog was summoned, because by that time (even though the weapon had not been located) nobody remained in the house to use the weapon or destroy evidence. TR 122-123. Officer Janis cleared his officers from the home and stayed at the front door while the canine officer and the drug dog searched the house. TR 76. From his vantage point at the front door, Officer Janis observed the drug dog make several "hits" throughout the house. TR 77-78. The drug dog hit on a handgun (.38 special) which was found in a laundry basket full of clothes the northwest bedroom . TR 78-81. The northwest bedroom was the bedroom in which Lawrence Vigil's wallet had earlier been found. TR 79. The clip which was found earlier in the kitchen did not match the .38 special found in the laundry basket. TR 125. No gun matching the clip was ever found. *Id.* The dog also alerted on some waxed paper bindles containing cocaine residue which the officers had not previously seen in plain view. TR 78, 134. The gun and the waxed paper bindles were the only evidence the dog discovered that had not previously been seen in plain view during the protective sweep. *Id.*

---

[8]Neither the search of the vehicles nor the items found within the vehicles are discussed in much detail because as explained below the automobile exception applies to the vehicles and neither Alvina White bull nor Lyle Wilson have a privacy interest in the vehicles–and therefore no basis upon which to challenge the search.

**Alvina White Bull's Testimony**

Alvina White Bull was awakened in the early morning hours of June 9, 2007 when the doorbell rang. TR 138. She told Lyle Wilson to go see who it was. When Lyle relayed that it was Alvina's son (Lawrence Vigil) at the door, Alvina instructed Lyle let him in. *Id.* She had no idea where Lawrence had been before he arrived at her house. TR 141. Lyle reported that Lawrence wanted a place to sleep that night, and Alvina needed to get up and make a bed for Lawrence. TR 139. Lawrence came in and went to the bathroom. TR 148. He had an injured ankle at the time and was using crutches. TR 149. When Alvina went to the living room to make a bed, she heard banging on the door. *Id.* She peeked out the window and saw Officer Janis pointing a gun at her. *Id.* Officer Janis said "open the door or I'll shoot." TR 139.

When she opened the window she saw several police cars, but none had their lights or sirens on. TR 141-42. She had no idea why law enforcement was at her house. TR 141. She does not agree that she lives in a high-crime area. TR 143. The only bad neighbor she has is Officer Janis's cousin. *Id.* They fight and beat each other up every day at that house. *Id.* Alvina acknowledged the police have also been summoned to her house at least three times for narcotics calls. *Id.*

Alvina opened the door and Officer Janis ran past her into the kitchen. He hollered for Officer Jamerson to take them out and search them. TR 139. Officer Jamerson brought her out first, then Lyle, then Lawrence. *Id.* They were all placed face down, straddled on the sidewalk in front of the house. *Id.* Alvina and Lyle were in their nightclothes, but Lawrence was still dressed because he had just arrived. TR 140. Officer Janis ordered Jamerson to search all of them but another officer searched Lawrence only and removed Lawrence's wallet from his pants pocket. *Id.* Alvina estimated the three of them laid on the sidewalk for fifteen or twenty minutes. *Id.* They were transported to jail and booked for intoxication. TR 141. Breathalyzer tests registered zero. *Id.* Alvina was not aware, however, that cocaine does not register on a Breathalyzer test. TR 145.

**Lyle Wilson's Testimony**

Lyle Wilson has previously been convicted of possession with intent to deliver drugs and retaliation against a witness in connection with a charge of assaulting a federal officer. TR 152.

Lyle lived in Alvina White Bull's[9] house on June 9, 2007. TR 150. He knew Alvina's son Lawrence, and was aware that on June 9, 2007, Lawrence had a badly sprained ankle for which Lawrence received pain pills, crutches, and bandages. TR 151.

## DISCUSSION

**Burden of Proof**

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976), but on the government to justify a warrantless search or seizure. *United States v. Bruton*, 647 F.2d 818 (8th Cir.1981). The standard of proof is a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

**The Parties' Positions**

Both defendants move to suppress all evidence seized or otherwise discovered, whether directly or indirectly as a result of the warrantless entry and search which occurred during the early morning hours of June 9, 2007 at the Alvina White Bull residence. Defendant White Bull likewise moves to suppress all "oral" evidence and all evidence obtained from the "illegal search and seizure [of] . . .vehicles on her property . . ."

The Government concedes that law enforcement officers did not have a warrant to enter Alvina White Bull's home, but asserts no Fourth Amendment violation occurred. The Government asserts that probable cause justified the arrest of Lawrence Vigil and therefore a protective sweep of Alvina White Bull's home, where the evidence was discovered in plain view. The Government further asserts that exigent circumstances justified the "brief search" to find the weapon. Finally, the Government asserts the contraband found within the vehicles is admissible because the information received from persons inside Alvina White Bull's home, combined with what the officers saw in plain view, combined to provide probable cause to search the vehicles without a warrant pursuant to the automobile exception.

---

[9]Alvina White Bull is Mr. Wilson's sister. TR 151.

**1. Mr. Vigil's Detention and Arrest**

A warrantless investigatory (*Terry)* stop is valid law enforcement has a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 25031, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999). Law enforcement must be able to identify specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. *Id.* During a *Terry stop,* "officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Navarrete-Barron*, 192 F.3d at 790 (citations omitted).

In the early morning hours of June 9, 2007, the Oglala Sioux police department received a 911 dispatch "gun call" indicating a suspect was involved in a fight near Melva White Bull's house. Officer Janis testified that the suspect has been identified as Lawrence Vigil. As Janis drove toward the scene, other officers' radio conversation indicated Lawrence had fled to his mother's (Alvina White Bull's) house. When Janis arrived at Alvina's house, he saw Lawrence in the front yard with what appeared to be a weapon in his hand. When Janis commanded Lawrence to stop and put his hands in the air, Lawrence did not obey the command but instead hesitated, then went into his mother's house. Officer Janis was a credible witness. Alvina and Lyle's claim that Lawrence had a sprained ankle and/or was using crutches on the date in question does not change the result. Even assuming Lawrence had a sprained ankle, the events could have happened in the manner described by Officer Janis.

Officer Janis testified that Alvina lived in a high-crime neighborhood which is known for gang and drug activity. Law enforcement is summoned to the neighborhood five or six times per week. Alvina admitted the police have been called to her own house at least three times for drug-related activities. Janis also explained that it is common on the Pine Ridge Reservation for large numbers of extended family to live together in the same home. It is also common that when police arrive to investigate an incident, the family members of the persons being investigated will arrive on the scene and attempt to interfere or harm the police officers. Given this scenario, Officer Janis had reasonable suspicion to pursue and detain Lawrence Vigil. *See United States v. Jones*, 759 F.2d 633, 642-43 (8th Cir. 1985) (reasonable suspicion sufficient for *Terry* stop when defendant ran from

police and stop occurred simultaneously with exit of known neighborhood burglar from the building who also tried to avoid the police); *United States v. Caruthers*, 458 F.3d 459, 465-66 (6th Cir. 2006) (reasonable suspicion sufficient for *Terry* stop when defendant matched description of suspect from 911 "shots fired" call, defendant made furtive movements when approached by police late at night in a high-crime area).

Vigil's warrantless arrest was also appropriate. Officer Janis testified that when the front door to Alvina's home opened, he could immediately see a thick smoke in the home and smell the odor of what he recognized as smoked or burned cocaine.

> Probable cause for a warrantless arrest hinges upon whether at the moment the arrest was made the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. In determining whether probable cause existed, we look to the objective facts available for consideration by the agencies or officers participating in the arrest.

*United States v. Neumann*, 585 F.2d 355, 357 (8th Cir. 1978) (citations omitted). The strong odor of drugs and the thick smoke within the house, along with the previous circumstances regarding the "gun call" provided probable cause to arrest Mr. Vigil. *See, e.g., United States v. Chauncey,* 420 F.3d 864, 871 (8th Cir. 2005) (strong odor of drugs sufficient for officer to conclude defendant had knowledge of drug activity).

### 2. Protective Sweep of Alvina White Bull's Home

In *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) the United States Supreme Court established a two-pronged test for determining whether a protective sweep incident to arrest is constitutionally permissible. First, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched." 494 U.S. at 334, 110 S.Ct. at 1093. This prong does not apply because Lawrence Vigil, Alvina White Bull and Lyle Wilson were all detained outside the home.

Second, a broader sweep is permitted "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337, 110 S.Ct. at 1093. Officer Janis articulated a

reasonable belief that Alvina White Bull's home may harbor unknown individuals who might pose a danger to those on the arrest scene. Specifically, he testified that: (1) it is common on the Pine Ridge Reservation for many members of an extended family to live together; [10] (2) Alvina lived in a high-crime area where it was common for fights to break out and for the police to be called several times a week; (3) when he approached the house, he could hear people running around inside; (4) he did not know how many people (other than Lawrence, whom he saw enter the house) were inside;(5) the dispatch call indicated Lawrence had a gun, but no gun was found on Lawrence's person. Given these circumstances, Officer Janis had a reasonable belief that the house may "harbor an individual posing a threat to those on the arrest scene."

A protective sweep "is not a full search of the premises, but may extend only to cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335-36, 110 S.Ct. at 1093. "*Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband." *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005). The prosecutor repeatedly asked whether the weapon had yet been found and emphasized that it had not as justification for the continuation of the sweep. It is concluded that the unlocated weapon, *combined with the unknown persons in the home*, constituted a reasonable suspicion of danger which justified the continuation of the protective sweep until all the rooms in the home were cleared and the officers were assured the home was empty.

### 3. Evidence Found In Plain View In the Home

Although a protective sweep does not authorize a search for weapons or contraband, the plain view doctrine permits the seizure of items which are discovered during a protective sweep if their incriminating nature is immediately apparent. *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999). After a bit of confusion, Officer Janis testified that all of the evidence found in Alvina White Bull's house which was identified during the evidentiary hearing *except the .38 special*

---

[10]This proved to be true in this instance, as Alvina White Bull, her brother (Lyle Wilson) her two adult children (Anna and Lawrence), her two grandchildren, and Anna's boyfriend were all found to be staying at the White Bull residence on the evening in question.

-11-

*handgun and the waxed paper bindles* were found in plain view during the protective sweep. All of the evidence found in plain view during the protective sweep should be admissible pursuant to *Boyd*.

### 4. Evidence Found in the Automobiles

Defendant White Bull also requests suppression of the evidence seized from the vehicles which were parked on her property in the early morning hours of June 9, 2007. Although the vehicles were parked in White Bull's yard/driveway, none of the vehicles were registered to White Bull or Lyle Wilson. "Because Fourth Amendment rights are personal and may not be asserted vicariously, we must first determine whether [the defendants] have a legitimate expectation of privacy in the area searched or the item seized." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). Because neither of these Defendants owned the vehicles in question, they have failed to show a legitimate expectation of privacy. *Id.* "It is well established that an individual does not have a reasonable expectation of privacy in another person's automobile." *United States v. O'Neal*, 16 Fed. Appx. 539, 541 (8th Cir. 2001) *citing Rakas v. Illinois*, 439 U.S. 128, 134-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *But see, United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001) (homeowner had reasonable expectation of privacy in vehicle parked in his driveway, but owned by third person). In this instance, even assuming White Bull and Wilson have shown a privacy interest in the vehicles (which they have not) the evidence is admissible because the officers had probable cause to search and the automobile exception applies.

"As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception." *United States v. Flatden*, 230 F.3d 1083, 1086 (8th Cir. 2000). Probable cause exits when given the totality of the circumstances "a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found . . ." *Id.* Such circumstances include viewing drug paraphernalia in plain sight in the vehicle, and finding evidence of drug activity within the home where the vehicle is parked. *Id.* Officer Janis testified that he viewed drugs, drug paraphernalia or alcohol (which is illegal on the Pine Ridge Reservation) in plain view through the windows of each of the vehicles. Drugs and drug paraphernalia had been found inside the home where the vehicles were parked. Additionally, Joey Yellow Hair told Officer Janis that usually the illegal drugs were ingested in the vehicles parked

outside.[11]   Given this information,   Officer Janis had sufficient probable cause to search the vehicles on Alvina White Bull's property without a warrant pursuant to the automobile exception.

   5.   **Evidence Found by the Drug Dog**

A warrantless search of a person's home is *per se* unreasonable absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).  "The warrant requirement is suspended when, in the press of circumstances beyond a police officer's control , lives are threatened, a suspect's escape looms, or evidence is about to be destroyed." *United States v. Duchi*, 906 F.2d 1278, 1282 (8th Cir. 1990) (citations omitted).  The opportunity to seek a warrant is not determinative, but it is "certainly relevant" when exigent circumstances are pleaded.  *Id.* at 1283.

Officer Janis testified that the .38 special and the waxed paper bindles were not found in plain view during the protective sweep, but were identified later when the drug dog arrived.  He candidly admitted that by the time the drug dog arrived, no suspects remained in the house and there was no danger of anyone using the still unlocated weapon or destroying the drug evidence which remained in the house.  Officer Janis had secured the premises and was stationed outside the house while the drug dog searched the home. He could have easily applied for a search warrant before deploying the drug dog.  In other words, any exigency which existed earlier had passed.  The purpose of the protective sweep (to locate any potentially dangerous persons in the home) had been accomplished.  "*Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband."  *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005).  Because the justification for the protective sweep had concluded and no exigent circumstances supported the

---

[11]Alvina White Bull also moves to suppress "oral" evidence obtained as a result of the illegal search or seizure.  No evidence was received during the hearing about any statements made by Ms. White Bull and no *Miranda* issues were raised.  It has already been determined that the protective sweep did not violate Ms. White Bull's Fourth Amendment Rights.  Assuming Ms. White Bull refers to the statements Joey Yellow Hair made about drug use in the vehicles, she has no standing to raise his Fourth Amendment rights and no expectation of privacy in statements made by him.  *United States v. Rodriguez-Arreola*, 270 F.3d 611, 616-17 (8th Cir. 2001) (defendant had no expectation of privacy in co-defendant's knowledge of illegal activities and therefore cannot challenge co-defendant's statements).

continued search, the evidence found by the drug dog (the .38 special and the waxed-paper bindles) should be suppressed.

**CONCLUSION**

For the reasons more fully explained above, it is respectfully recommended to the District Court that Defendant White Bull and Defendant Wilson's Motions to Suppress (Docs. 200 and 203) be **GRANTED** in part and **DENIED** in part as follows: all evidence which is the subject of the motions to suppress found in plain view during the protective sweep in Alvina White Bull's home and in the vehicles on the premises should be admissible. The .38 special handgun and the waxed paper bindles which were found by the drug dog should not be admissible.

**NOTICE TO PARTIES**

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this 18th day of February, 2009.

                                          BY THE COURT:

                                          s/John E. Simko
                                          _____
                                          John E. Simko
                                          United States Magistrate Judge